# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KENNETH JACKSON,

        Plaintiff,

    v.                                      Case No. 08-CV-647

GEORGIA KOHLWEY, LARRY WELNICKE,
DR. R. L. KLASSEN, and DR. AUGUSTINE,

        Defendants.

## ORDER

The plaintiff, Kenneth Jackson, a Wisconsin state prisoner, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. He is proceeding *in forma pauperis* on claims that the defendants were negligent and deliberately indifferent to his serious medical needs while detained at the Manitowoc County Jail (MCJ). Before the court are defendants Kohlwey and Welnicke's motion for summary judgment, and defendants Klassen and Augustine's motion for summary judgment.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that,

under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Id.* at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ..."); Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, ... upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

-2-

## II. FACTS[1]

### A.    Defendants Kohlwey and Welnicke's Proposed Facts

Jackson began his pretrial detainment at the MCJ on September 30, 2005. On October 23, 2005, at approximately 3:30 a.m., Officer Steffens was performing a security check in the 3D Block when Jackson began talking loudly and refused to quiet down.  As a result, Steffens and other officers escorted Jackson from his cell on the third floor to Cell 1R1, a segregation cell in the receiving area on the first floor that has a toilet, wash basin, and working shower.

Jackson alleges that he repeatedly asked to be moved to another cell because Cell 1R1 had blood and feces smeared on the wall and mattress.  (Compl. ¶ 1.)  He further alleges that the deputy refused to provide him with cleaning supplies to clean out the room, thus forcing him "to sleep on the nasty, feces and blood smeared mattress."  (*Id.*; Affidavit of Kenneth Jackson [Jackson Aff.] ¶ 4.)  Officer Steffens, on the other hand, avers when she placed Jackson in Cell 1R1, the cell was clean.

It is undisputed Jackson did not complain to Officer Steffens about the conditions of the cell when placed there nor did he ask to be moved to a different cell.  Approximately two hours and fifteen minutes prior to Jackson being moved to

---

[1] Facts are included in this section to the extent they comply with Federal Rule of Civil Procedure 56(e)(1) and the Local Rules.  Facts are undisputed unless otherwise noted.

Jackson filed numbered responses to the defendants' Proposed Findings of Fact in which he sets forth disputes to some of the defendants' proposed facts.  While most of Jackson's responses cite to admissible evidence, several cite to an unspecified paragraph in his affidavit, "(Jackson Aff., at ¶ __)", and no support for some of these responses could be found in his affidavit.  (*See, e.g.,*, Jackson's Resp. to Defs.' Kohlwey and Welnicke's PFOF ¶ 21.)  Such unsupported "disputes" are not included in this section.

Case 2:08-cv-00647-JPS   Filed 03/19/10   Page 3 of 24   Document 96

1R1, cleaning was completed in the receiving area of the first floor, including Cell 1R1, and linens were exchanged on the first floor that morning.

Jackson was released from segregation on October 25, 2005. Upon release from segregation, he "immediately" took a shower and noticed a large abscess on his left hip 'that continued to grow and became painfully sore." (Compl. ¶ 1.)

On October 29, 2005, Jackson requested to see a nurse regarding a boil on his lift hip and right arm. On October 31, 2005, defendant Nurse Kohlwey examined Jackson and observed a boil on his left buttock and another on his armpit. He told Kohlwey that the boils had been present for a couple days but never mentioned that he recently had spent time in a segregation cell which contained blood or feces, nor did he complain in any way about the sanitary conditions of the jail.[2] As a registered nurse, Kohlwey had no authority to order a culture or prescribe prescription medication. Nurse Kohlwey arranged for Jackson to be taken to the Holy Family Memorial Walk-In Care Clinic at Harbor Town in Manitowoc, later that same day.

At the clinic, Jackson saw defendant Dr. Klassen who noted pimples on his right armpit and a boil on his left thigh. Dr. Klassen lanced Jackson's boil, prescribed the antibiotic cephalexin monohydrate (Keflex) (500 mg 4 x/day), hydrocodone (Vicodin), ibuprofen as needed, and warm tub soaks.

---

[2] Jackson disputes this and avers that on October 31, 2005, he informed Nurse Kohlwey that he had recently been released from segregation which had blood and feces spread on the wall and floor.

-4-

As a registered nurse, Kohlwey had no authority to override a diagnosis or course of treatment ordered by a medical doctor. After returning to the jail, Jackson was treated in accordance with Dr. Klassen's instructions. By November 18, 2005, Kohlwey noted that the boils for which Jackson saw her on October 31, 2005, were essentially healed.[3]

On November 27, 2005, Jackson requested to see a nurse for two bumps on the back of his head and Nurse Kohlwey saw him the same day, providing him with a hot pack and antibiotic ointment. On November 28, 2005, Jackson requested to see a nurse for the same problem and the following day, he was seen by Kohlwey's boss, Amy Wergin, RN, who noted that two areas on Jackson's scalp were open and appeared to be infected, and provided Jackson with triple antibiotic ointment, told him not to shave his head, and recommended that he use ibuprofen as need for pain. On December 1, 2005, Jackson requested to see a nurse for the bumps on his head and the next day he was seen by Nurse Wergin who sent him additional ibuprofen and told him to continue using compresses. On December 7, 2005, Jackson requested to see the nurse for a bump on his head and requested more triple antibiotic ointment. Nurse Kohlwey responded the same day, arranged for Jackson to be provided with two packets of triple antibiotic ointment, and told him again to stop shaving his head because short hairs can grow back under the skin

---

[3] Jackson does not dispute that the original boils appeared to be healed but he avers that other boils appeared in different locations and seemed to be spreading. (Jackson Aff. ¶ 9.)

and cause razor bumps. On December 12, 2005, Jackson requested to see a nurse for the bump on his head and a bump on his hip. Nurse Kohlwey saw him on December 14, 2005, noticed a small bump on Jackson's right buttock that appeared to be a "zit scratched off," told him to apply hot packs and triple antibiotic ointment to the area, and gave him more ibuprofen and hospital lotion to offset his dry skin. On December 26, 2005, Jackson requested to see a nurse for the bump on his head and on December 29, 2005, Kohlwey saw Jackson, noted three to four "zit" type areas on his head, and instructed him again to stop shaving his head. On January 2, 2006, Jackson requested to see a nurse for bumps on his head and to obtain more pain pills. On January 4, 2006, Kohlwey saw Jackson, observed "zit type activity" that was "in various stages on healing," observed that Jackson continued to shave his head and again instructed him not to do so, and provided him with a bottle of antiseptic wash, bio washes, four packs of triple antibiotic ointment, and a box of ibuprofen.

Kohlwey did not know that Jackson had Methicillin-resistant Staphylococcus Aureaus (MRSA), when the only symptoms that Jackson was complaining about or exhibiting in late November through early January were consistent with folliculitis, which is what she believed he had. Folliculitis is a superficial skin condition characterized by the inflammation or infection of one or more hair follicles, which typically clears up on its own, without any medical intervention, and commonly appears on the scalp and can be caused by shaving.

-6-

Jackson alleges that by January 6, 2006, "more aggressive bumps had colonized and spread across different parts of plaintiff body." (Compl. ¶ 15.) On January 6, 2006, Jackson submitted a request slip and was seen that same day by Kohlwey who observed that, in addition to the bumps on his head, he had three bumps under his right armpit. Because the bumps were no longer only present on Jackson's head, Kohlwey became concerned that the bumps might not be due to shaving, she immediately called Lakeshore Family Medicine, and was told Dr. Klassen could see Jackson the following week.

On January 9, 2006, Jackson was taken to Holy Family Memorial Walk-In Care Clinic where he was seen by Dr. Klassen. During this visit, Jackson mentioned for the first time that he was concerned about the hygienic conditions of the jail. He did not mention his stay in Cell 1R1, but rather complained generally about jail conditions. Jackson also complained about pain in his armpit. Dr. Klassen noticed an infection in his armpit. He aspirated Jackson's right axillary area, submitted a sample of the fluid for culture, and also noted that Jackson had folliculitis of the scalp. Dr. Klassen prescribed Keflex/cehpalexin monohydrate four times a day for ten day, warm showers to the right axilla, and Vicodin as need for pain.

On January 10, 2006, Jackson's medications arrived at the jail and he began receiving treatment in accordance with Dr. Klassen's instructions. On January 11, 2006, Jackson asked to see a nurse, due to pain in his head and his medicine not working. Nurse Kohlwey informed him that antibiotics take 48 to 72 hours to begin

working, that his condition should start to improve, and that he already had pain medication.

On January 12, 2006, Jackson requested to see the nurse for pain in his head. It was noted that Jackson had been ringing staff four to six times per shift and a corrections officer had observed him sleeping from almost lunch to supper the previous day, when he had submitted a request slip to see the nurse because "my head hurts bad in pain," and was then up and about the cell block hi-fiving others. (Kohlwey Aff. ¶ 39, Ex. P pp. 1, 2.) Jackson submitted a second request the same day, complaining of head pain and threatening to write to the NAACP. That day, Officer Rochon observed him for thirty minutes, during which time Jackson was seen laughing, talking, and dancing around his cell block and then sitting at a table with other inmates where he continued talking and joking while watching television.[4] On January 13, 2006, Nurse Kohlwey told Jackson that he had already been seen by a doctor on January 9, 2006, that the antibiotic took a while to work, and that he already was on a "high powered" pain medication (i.e., Vicodin). Kohlwey also told Jackson that if it became apparent that he needed further intervention, it could be arranged, but that he must have some patience. On January 13, 2006, Jackson requested to take all of his medication at one time, to which Kohlwey responded the

---

[4] Jackson disputes this and avers that at no time during January 2006 was he laughing and joking with others, nor "hi-fiving" other prisoners at the MCJ. (Jackson Aff. ¶ 25.)

same day and told him that antibiotics must be spaced out and that pain pills are to taken only as needed.[5]

On January 16, 2006, Dr. Klassen informed Nurse Kohlwey that the aspirate culture from Jackson's right acilla tested positive for MRSA. Twenty to thirty percent of all people in the general population are carriers of MRSA bacteria on their skin and/or in their noses, but do not become infected until it enters their system through a cut or other open wound, such as an abrasion, of their skin. After diagnosing Jackson with MRSA, Dr. Klassen noted in his medical records, "At this point it is difficult to know what to do. As being real honest this inmate is very demanding and tends to, according to the jail nurse have multiple requests per day. He apparently has refused to take his antibiotics and has demanded to see a specialist." (Ewald Aff. ¶ 2, Ex. A, p. 48.) Dr. Klassen decided to have Jackson continue using the Keflex and, if no improvement, to schedule an appointment to see Dr. Augustine, Jackson's usual doctor. Dr. Klassen did not think that the infection was severe enough that he needed to be rushed in to his office. Dr. Klassen informed Kohlwey of his recommendations.

On January 17, 2006, Kohlwey informed Jackson that he had MRSA, explained to him that the problem is within his body, that he will always be a carrier, and that it will surface occasionally. She instructed Jackson to be careful with his

---

[5] Jackson avers that he submitted this request because the pain was still unbearable and additional boils were spreading despite use of the antibiotic ointments. (Jackson Aff. ¶ 29.)

-9-

body waste, mucous, and discharge from any pustules and to avoid skin to skin contacts. Kohlwey also told him that only specific antibiotics help, that he must take them as prescribed, and to let staff know if he had any exacerbation or other problems. After his discussion with Kohlwey, Jackson agreed to take his antibiotics, which he had refused earlier in the day.[6]

On January 22, 2006, Kohlwey met with Jackson to discuss his MRSA infection again. On January 23, 2006, Kohlwey called Lakeshore Family Medicine to discuss Jackson's condition and ask whether he should be seen by the doctor. Dr. Augustine told Kohlwey that he felt that the antibiotics that Jackson already took were sufficient and that Jackson had a skin issue which could be treated with bacitracin ointment and hot soaks for the trouble areas. Dr. Augustine did not feel that Jackson needed to be brought back to the clinic at that time. Dr. Augustine further advised Kohlwey that he had known Jackson for a long time and that Jackson's request for additional hydrocodone would be denied, but that he could use ibuprofen as needed for pain.[7]

Kohlwey informed Jackson of her phone call with Dr. Augustine. Then, on January 25, 2006, Jackson submitted a MCJ Inmate Grievance Form in which he stated, "My grievance is medical negligence. I have written numerous request to the

---

[6] Jackson avers that he refused to take his medication because he felt it was not working and did nothing to stop his pain and suffering. (Jackson Aff. ¶ 32-33.)

[7] Jackson avers that Dr. Augustine denied him Vicodin based on hearsay information relayed to him by Nurse Kohlwey that he was "dancing around his cell block" and "laughing and joking while watching television." (Jackson Aff. ¶ 35.)

-10-

nurse for my problem. The clinic is also negligent for not take a culture in 10-05 when I went for my hip. I now know what I have "Mersa infection." But it took months to find out about it." (Welnicke Aff. ¶ 18, Ex. C.)

Defendant Welnicke, the former jail administrator, relies on the jail nurse to see and assess inmates for their medical needs and to provide them with appropriate care or, when necessary, to arrange to have them taken to the emergency room at one of the local hospitals or to be seen by a medical doctor at a local clinic.

On February 4, 2006, Mr. Welnicke, Nurse Kohlwey, and Nurse Wergin met with Jackson to discuss the issues on his January 25, 2006 Grievance Form, speaking with him at length about his medical issues. Nurse Wergin performed a follow-up examination on Jackson on February 6, 2006, and answered any questions he had. By that time, Jackson's previous problems were essentially healed.

On March 13, 2006, Jackson requested to see the jail nurse for another outbreak. That day, Nurse Kohlwey examined him and noted some new spots on his right hip and a spot on his right nipple. Kohlwey immediately called Lakeshore Family Medicine and left a message. Dr. Klassen's nurse returned Kohlwey's call on Marsh 15, 2006, and said that Dr. Klassen had ordered tetracycline, a different antibiotic, for Jackson. Jackson was given tetracycline in accordance with the doctor's recommendation. The spots which Jackson had on March 13, 2006, cleared up or healed as of March 22, 2006.

-11-

Jackson does not complain regarding his condition or any treatment that he received beyond March 2006. His pretrial detention at MCJ ended on May 23, 2006.

## B. Defendants Klassen and Augustine's Proposed Facts

Defendants Klassen and Augustine are medical doctors who became board certified in Family Medicine in 1981 and 1992, respectively. They are employed with Holy Family Memorial and provide services at the Lakeshore Family Medicine Clinic in Manitowoc, Wisconsin. At all times relevant, Dr. Klassen and Dr. Augustine had no contract or agreement with the MCJ to provide treatment for detainees. They did not visit MCJ detainees in the jail facility. There are no "bonuses or other incentives provided" to private physicians for the care of MCJ detainees. (McLeRoy Aff., Ex. E [Welnicke Int. #6]). The MCJ made the decision where to take detainees for treatment, whether Dr. Klassen, Dr. Augustine, or another local clinic. The State of Wisconsin does not direct Dr. Klassen or Dr. Augustine how to provide medical care for Mr. Jackson.

### Jackson's Presentation/Care at Lakeshore Family Medical

On October 31, 2005, Jackson was escorted to the Lakeshore Family Walk-In Clinic where he presented with a left hip boil or abscess, smaller spots under his armpit, and complaints of pain. Dr. Klassen incised and drained the hip boil, prescribed an antibiotic, Keflex, and provided pain relief that included a Toradol injection, a prescription for Ibuprofen 800 mg 4 times a day, and for Vicodin, 2 every

-12-

5 to 6 hours as needed for pain. Dr. Klassen also advised warm tub soaks of the abscess area three times a day, with follow-up in the clinic as needed.

On January 6, 2006, Nurse Kohlwey advised Dr. Klassen that Jackson was developing a lump similar to that which he had previously in his armpit. Dr. Klassen treated Jackson at the walk-in clinic on January 9, 2006. He cultured one of Jackson's spots and in the interim diagnosed him with hidradenitis suppurativa (inflamed lesions) and folliculitis of the scalp (infection of hair follicles). Dr. Klassen prescribed Keflex, recommended warm water showers to the right armpit three times per day, and prescribed pain relief with Vicodin, up to four times a day as needed.

On January 16, 2006, Dr. Klassen advised the county jail nurse that Jackson's culture tested positive for MRSA. Dr. Klassen was informed that Jackson refused to take his antibiotics and wanted to see a specialist. He advised Jackson to continue on the Keflex and shower three times a day. Dr. Klassen anticipated if Jackson showed no improvement with the Keflex, he should return to the clinic to see Dr. Augustine, his usual doctor, and consider IV antibiotics.

On January 23, 2006, Nurse Kohlwey called the clinic with a report that Jackson now had a lump on his penis and with additional questions regarding the MRSA findings. Dr. Augustine advised that treatment for the penis would be to treat locally for an open wound or drainage, neither of which he had at that time. Dr. Augustine further considered a request by Jackson for a refill of hydrocodone (Vicodin), and, based upon Jackson's reported presentation of dancing around his

-13-

jail cell, he denied the prescription but directed that Jackson's pain complaints be treated with ibuprofen.[8]

On March 15, 2006, the MCJ nurse called the Clinic and spoke to Nurse Practitioner Barb Backus to advise of another outbreak of lesions. Nurse Backus prescribed an antibiotic, Tetracycline, twice a day for ten days. She requested a report if it did not help or if Jackson had a reaction. On April 26, 2006, the MCJ nurse again called the clinic reporting that the previous lesions had cleared up, but that Jackson had one lesion reoccur for which she requested a prescription be made available should the symptoms worsen. On the same day, Nurse Backus provided a prescription for Tetracycline, if needed.

**Standard of Care**

It is Dr. Klassen's professional opinion that Jackson's lesions and MRSA were treated appropriately, within the standard of care, skill, and judgment which reasonable family practitioners would exercise in the same or similar circumstances, having due regard for the state of medical science in 2005 and 2006.[9] Both Dr. Klassen and Dr. Augustine have treated patients with MRSA. Based upon experience, Dr. Klassen believes "MRSA is usually not an emergent or life threatening illness. MRSA is not generally considered serious unless it is associated

---

[8] Jackson avers that he was never dancing around his cell. (Jackson Aff. ¶ 25.)

[9] Jackson avers that Dr. Augustine's decision not to treat his severe pain was not based on his medical opinion or judgment, but rather on an erroneous "rumor" or "hearsay allegation" that Jackson was "dancing around his cell," which was false. (Jackson Aff. ¶ 35.)

-14-

with other symptoms such as fever, chills and sweats which indicate a spread throughout the body." (McLeRoy Aff., Ex. B [Klassen Int. #4]). On both physical examinations of Jackson at the Lakeshore Family Medicine Clinic, he denied fever or chills.

### Lawsuit

Jackson failed to file a request for mediation as required in Wisconsin Statute § 655.44. On January 28, 2009, defendants Klassen and Augustine served interrogatories on Jackson, requesting identification of experts who would provide testimony that either defendant acted outside the appropriate standard of care and identification of damages and supporting witnesses thereof. On April 6, 2009, after hearing nothing from Jackson, defendants wrote Jackson reiterating that discovery had been served on him on January 29, 2009, that required a response within 30 days of service, but that no answers had been forthcoming. Jackson did not respond to the Interrogatories served by Dr. Klassen and Dr. Augustine.

## III. ANALYSIS

Defendants Kohlwey and Welnicke contend that: (1) Jackson has not set forth facts to sustain his burden of proving that Nurse Kohlwey acted with deliberate indifference or that Mr. Welnicke violated his constitutional rights; and (2) Jackson has not set forth facts to sustain his burden of proving that they were negligent. Defendants Klassen and Augustine contend that: (1) Jackson's section 1983 claim fails because they were not acting under color of state law, and because they acted

-15-

reasonably and not with deliberate indifference; and (2) Jackson's state law medical malpractice claim fails because they acted within the appropriate standard of care, because expert testimony is required to prove medical malpractice, and because Jackson failed to comply with Wis. Stat. § 655.44.

In response, Jackson argues that: (1) Nurse Kohlwey showed deliberate indifference to his serious medical need when she failed to contact a medical doctor to recommend taking a culture of his infection and to provide additional pain medication, and when she failed to timely notify a doctor that his injury was not healing; (2) Nurse Kohlwey was negligent when she failed to obtain adequate pain medication and a culture of his infection and when she did not alert doctors that his injury was not healing; (3) Drs. Klassen and Augustine showed deliberate indifference to his serious medical need when they failed to take a culture of his infection in a timely manner; and (4) his state law negligence claim should be stayed until such time as he may properly file his request for mediation.

## A. Defendant Welnicke

In the complaint, Jackson alleges that Welnicke failed to address Jackson personally and that he agreed with Manitowoc County not to hire a doctor to conduct on-site medical examinations for pretrial detainees. Defendants Kohlwey and Welnicke contend that Welnicke's motion for summary judgment should be granted because Jackson has not responded to it.

-16-

Jackson's summary judgment response did not address Welnicke's argument that there is no constitutional claim against him. Jackson has thus abandoned his claim against Welnicke, and summary judgment in favor of the defendants is proper as to that claim. *See, e.g., Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are waived); *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 624 n.3 (7th Cir. 2001) (same); *Donelson v. City of Chicago*, 272 F. Supp. 2d 717, 725 (N.D. Ill. 2003) (treating plaintiff's harassment claim as abandoned where she merely contended that she was harassed, but provided no legal arguments in support of the claim and "ma[de] no serious efforts to respond to he [defendant's] argument against it" in her summary judgment opposition brief).

**B.    Deliberate Indifference Claim**

Nurse Kohlwey contends that she was not deliberately indifferent to Jackson's medical need. Jackson, on the other hand, contends that Nurse Kohlwey was deliberately indifferent when she failed to contact a medical doctor to recommend taking a culture of his infection and to provide additional pain medication, and when she failed to timely notify a doctor that his injury was not healing.

It is well-established that a pretrial detainee must be afforded certain protections under the Fourteenth Amendment, including access to adequate medical care. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002) (citations omitted). Due process rights are at least as great as the protections afforded a

-17-

convicted prisoner under the Eighth Amendment. *Id.* Accordingly, when considering a pretrial detainee's claim of inadequate medical care, the analogous standards under the Eighth Amendment are often used. *Id.*

The Eighth Amendment's prohibition of cruel and unusual punishment forbids deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976). To establish liability, a prisoner must demonstrate two elements: an objectively serious medical condition; and, an official's deliberate indifference to that condition. *See Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006). A medical condition is objectively serious if a physician has determined that treatment is mandated, or if it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 584-85 (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). A prison official is deliberately indifferent if he knows of a substantial risk of harm and disregards that risk.

In this case, it is undisputed that Nurse Kohlwey responded promptly to Jackson's repeated requests to see a nurse. She initially thought he had folliculitis because his symptoms presented as such. She arranged for Jackson to be taken to an outside clinic immediately after he presented with symptoms inconsistent with follicultis. She followed the doctors' treatment instructions, and telephoned the doctor with questions or to discuss Jackson's treatment. Nurse Kohlwey also discussed Jackson's medical needs with him, both before and after he was diagnosed with MRSA. She explained to him why it was important to take his

medication as prescribed, and why, for example, he should not stop taking it if it seemed to not be working right away and also why he should not take all of his medication at one time. It is undisputed that, as a registered nurse, Kohlwey did not have the authority to prescribe medications.

Contrary to Jackson assertions, the undisputed facts show that Nurse Kohlwey was a competent and thorough medical professional, who may have gone beyond the call of duty in her care for this particular patient. On this record, Jackson's contention that Nurse Kohlwey acted with deliberate indifference is unfounded.

## C.    Negligence Claim

The general common law duty of jail and prison officials to provide appropriate medical care for prisoners is reflected in the American Law Institute's Restatement of the Law of Torts. *See* Restatement (Second) of Torts § 314A(4) (1965).[10] *Taylor v. Wauwau Underwriters Co.*, 423 F. Supp. 2d 882, 886-87 (E.D. Wis. 2006). At common law, a jailer's negligence in providing such care gives rise to liability to the prisoner for any resulting loss. *Brownelli v. McCaughtry*, 182 Wis. 2d 367, 514 N.W.2d 48, 50 (1994). Wisconsin law defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or

---

[10] Restatement (Second) of Torts § 314A describes the duty that a common carrier owes to its passengers. With respect to the duty of a jailer or prison guard, subsection (4) states: "One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."

Case 2:08-cv-00647-JPS   Filed 03/19/10   Page 19 of 24   Document 96

similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999); *Schuster v. Altenberg*, 144 Wis. 2d 223, 229, 424 N.W.2d 159, 161-62 (1988). Like all claims for negligence, a claim for medical malpractice includes the following four elements: (1) a breach of (2) a duty owed (3) that results (4) harm to the plaintiff. *Paul v. Skemp*, 2001 WI 42 ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860 (2001). Thus, to establish a prima facie medical negligence claim, Jackson must show that Nurse Kohlwey failed to use the required degree of skill exercised by an average nurse, that he was harmed, and that there is a causal connection between Kohlwey's failure and Jackson's harm. Wis. J-I Civil 1023.

Moreover, unless the situation is one in which common knowledge affords a basis for finding negligence, medical malpractice cases require expert testimony to establish the standard of care. *Wade v. Castillo*, 658 F. Supp. 2d 906 (W.D. 2009) (citing *Carney-Hayes v. Nw. Wis. Home Care, Inc.*, 2005 WI 118 ¶ 35, 284 Wis. 2d 56, 699 N.W.2d 524 (2005)). Jackson's situation is not one in which the common knowledge of laypersons affords a basis for finding negligence; in general, laypersons do not know how to identify and treat MRSA.

In this case, Jackson has not raised a genuine issue of material fact that Nurse Kohlwey failed to treat him properly. In addition, he has not submitted expert testimony to establish the standard of care. Thus, his negligence claim against Kohlwey will be dismissed.

**D.**   **Defendants Dr. Klassen and Dr. Augustine**

**1.**   **State Actor Requirement**

Jackson claims that Drs. Klassen and Augustine were deliberately indifferent because they failed to take a culture of his infection in a timely manner. He also challenges Dr. Augustine's decision to not prescribe him additional Vicodin for his pain, but instead for prescribing a different, less-powerful pain medication. Specifically, Jackson claims that Dr. Augustine's decision was based on Nurse Kohlwey's information that Jackson had been laughing and joking with other inmates, and dancing around his cell.

These defendants contend that Jackson's § 1983 claim against them fails because they were not acting under color of state law. Jackson did not respond to this argument in his summary judgment response brief and thus, his § 1983 claim is subject to dismissal on that basis. *See, e.g., Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are waived).

"When a plaintiff brings a section 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under the color of state law." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009). The "state action doctrine" requires a finding of a "close nexus between the State and the challenged action" that the challenged action "may be fairly treated as that of the State itself." *Id.* (quoting *Jackson v.*

-21-

*Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Id.* (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

In *West v. Atkins*, 487 U.S. 42, 57 (1988), the Supreme Court held that, when a physician is employed by the state to provide medical services to state prison inmates, that physician acts under the color of state law for purposes of section 1983. The Court emphasized the function of the physician, not the particular contractual agreement the physician had with the state:

> It is the physician's *function* within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the *relationship among the State, the physician, and the prisoner*. Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoner of the means to vindicate their Eighth Amendment rights. The State bore an affirmative obligation to provide adequate medical care to West. The State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract.

487 U.S. at 55-56 (emphasis added).

Under *West's* "public function test," the analysis ought to focus on the relationship among the state, the health care provider, and the prisoner. *Plymouth*, 577 F.3d at 826. In assessing this trilateral relationship, an examination of the

-22-

following factors is beneficial: (1) the setting in which the medical care is rendered; (2) the contractual relationship between the state and the medical care provider; and (3) the relationship of the private provider to the prisoner.

Unlike *West*, in this case, it is undisputed that Dr. Klassen and Dr. Augustine are privately employed medical doctors, that they have no contract or agreement with the MCJ to provide treatment to its inmates, that they do not visit MCJ inmates at the jail, that there are no "bonuses or other incentives provided" to private physicians for the care of inmates at the MCJ, and the MCJ made the decision where to take inmates for treatment, whether to Dr. Klassen, Dr. Augustine, or another local clinic. Direct medical care from these defendants was rendered at the clinic, not at the jail.

Although the court need not decide whether Drs. Klassen and Augustine are state actors because, as indicated, Jackson did not address this argument, a review of the relevant case law shows that most likely they are not. Thus, the constitutional claim will be dismissed.

### 2. Negligence Claim

In response to the defendants' motion for summary judgment on this claim, Jackson requests that the claim be stayed so that he may properly file his request for mediation under Wis. Stat. § 655.44. Under that statute, Jackson may not file his medical malpractice claim "unless a request for mediation has been filed." Wis Stat. § 655.44(5).

-23-

However, this state claim is the only remaining claim in this case and the court declines to exercise supplemental jurisdiction over the claim. *See Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906 (7th Cir. 2007).

Accordingly,

**IT IS ORDERED** that defendants Kohlwey and Welnicke's motion for summary judgment (Docket #55) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that defendants Klassen and Augustine's motion for summary judgment (Docket #62) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** on its merits together with costs as taxed by the Clerk of the Court.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 19th day of March, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-24-